**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

U.S. Well Services, Inc., and
U.S. Well Services, LLC,
      Plaintiffs,

          v.

Halliburton Company, and
Cimarex Energy Co.,
      Defendants.

Case No. 6:21-cv-00367-ADA

**JURY TRIAL DEMANDED**


**COUNTER-DEFENDANT U.S. WELL SERVICES, LLC'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL STANDARD ........................................................................................... 2

III.    AGREED TERMS ................................................................................................ 4

    A. Halliburton's Asserted '949 Patent ................................................................. 4

        1.      Background of the '949 Patent ........................................................... 4

        2.      Agreed Term: "a sand system with a means for determining an output rate of the sand system" (Claim 8) ............................................. 4

IV.     CLAIM CONSTRUCTIONS OF THE DISPUTED TERMS ............................. 5

    A. Halliburton's Asserted '475 Patent ................................................................. 5

        1.      Background of the '475 Patent ........................................................... 5

        2.      Disputed Terms: "distribution unit" (Claims 1-4, 6-9, 13, 15) and "body" (Claims 1, 3, and 12) .............................................................. 6

    B. Halliburton's Asserted '472 Patent ................................................................. 10

        1.      Background of the '472 Patent ........................................................... 10

        2.      Disputed Term: "impacted regions" (Claims 1, 8, and 15) ................ 11

    C. Halliburton's Asserted '695 Patent and '725 Patent ....................................... 16

        1.      Background of the '695 Patent and '725 Patent ................................. 16

        2.      Disputed Term: "pre-gel storage unit" ('695 Patent: Claims 27, 28, 33, 44-48, 50, 52-55, 57, 62-63, 70-72, 74, 76-79, 88, 96-98, 100, 102-105) ('725 Patent: Claims 83, 85, 86, 89, 91, 92) ................... 17

        3.      Disputed Term: "partially hydrate" ('695 Patent: Asserted Claim 27).............. 18

    D. Halliburton's Asserted '325 Patent ................................................................. 20

        1.      Background of the '325 Patent ........................................................... 21

        2.      Disputed Term: "does not agree" (Claims 1 and 4) .......................... 21

        3.      Disputed Term: "inconsistent output" (Claims 9 and 13) ................. 23

    E. Halliburton's Asserted '333 Patent ................................................................. 25

        1.      Background of the '333 Patent ........................................................... 25

        2.      Disputed Term: "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure" (Claims 1, 5, and 9) ... 25

V.      CONCLUSION..................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Arendi S.A.R.L. v. Google LLC*,
   882 F.3d 1132 (Fed Cir. 2018) ................................................................. 9

*BCS Software, LLC v. Open Text, Inc.*,
   No. 6:21-cv-00050-ADA (W.D. Tex. Oct. 20, 2021) ............................. 2

*Berkheimer v. Hewlett-Packard Co.*,
   881 F.3d 1360 (Fed. Cir. 2018) ............................................................ 25

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH*,
   224 F.3d 1308 (Fed. Cir. 2000) ............................................................ 24

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ..................................................... 13, 15

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ............................................................ 27

*Digital Retail Apps, Inc. v. H-E-B*,
   No. 6-19-CV-00167-ADA, 2020 U.S. Dist. LEXIS 11094 (W.D. Tex. Jan. 23, 2020) .......... 3

*Eceipt, LLC v. Victoria's Secret Stores, LLC*,
   No. 6:20-CV-747-ADA, No. 6:20-CV-754-ADA, 2021 U.S. Dist. LEXIS 167543 (W.D. Tex.
   Sept. 3, 2021) ................................................................................. 3, 18

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ............................................................... 3

*Image Processing Techs., LLC v. Samsung Elecs. Co.*,
   No 2:16-CV-505, 2017 U.S. Dist. LEXIS 95448 (E.D. Tex. June 21, 2017) .......................... 2

*Intellectual Ventures I LLC v. T Mobile USA, Inc.*,
   No. 2:17-CV-577-JRG, 2018 U.S. Dist. LEXIS 189510 (E.D. Tex. Nov. 6, 2018) .............. 27

*Interval Licensing, LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) .......................................... 19, 23, 27, 28

*João Control & Monitoring Sys., LLC v. Protect Am., Inc.*,
   No. 1-14-CV-134-LY, 2015 U.S. Dist. LEXIS 109187 (W.D. Tex. Aug. 18, 2015) .. 19,24, 27

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
   No. 2:12-cv-800-WCB, 2014 U.S. Dist. LEXIS 102136 (E.D. Tex. July 28, 2014) ............... 3

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967, 977 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996) ................................. 2

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) ................................................................... 16

*Nautilus Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) .......................................................................... passim

*Phillips v. AWH Corporation*,
  415 F.3d 1303 (Fed. Cir. 2005) ......................................................... 2, 5, 10, 13

*Prolifiq Software Inc. v. Veeva Sys.*,
  No. C 13–03644 SI, 2014 WL 3870016 (N.D. Cal. Aug. 6, 2014) ......................... 3

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) .................................................................. 2, 18

*Uniloc 2017 LLC v. Google LLC*,
  No. 2:18-CV-00503-JRG-RSP, 2020 U.S. Dist. LEXIS 16314 (E.D. Tex. Jan. 30, 2020) 9, 10

*Versata Software, Inc. v. Zoho Corporation*,
  213 F.Supp.3d 829 (W.D. Tex. 2016) ......................................................... 3

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................... 15

## Statutes

35 U.S.C. § 101 ......................................................................................... 21

35 U.S.C. § 112(6) ...................................................................................... 4

35 U.S.C. § 112, ¶ 2 ............................................................................. passim

iv

## I.      INTRODUCTION

Pursuant to the Agreed Scheduling Order (Dkt. 51) and the Court's Standing Order Governing Proceedings – Patent Case (Dkt. 53), Plaintiff/Counter-Defendant U.S. Well Services, LLC ("USWS") hereby submits its Opening Claim Construction Brief in support of its proposed constructions for U.S. Patent No. 7,836,949 ("the '949 Patent"), U.S. Patent No. 10,900,475 ("the '475 Patent"), U.S. Patent No. 10,948,472 ("the '472 Patent"), U.S. Patent No. RE 46,725 ("the '725 Patent"), U.S. Patent No. RE 47,695 ("the '695 Patent"), U.S. Patent No. 7,574,325 ("the '325 Patent"), and U.S. Patent No. 9,435,333 ("the '333 Patent") asserted by Defendant/Counter-Plaintiff Halliburton Energy Services, Inc. and Counter-Plaintiff Halliburton US Technologies, Inc. (collectively, "Halliburton" and the "Asserted Halliburton Patents").

For context, USWS filed its Original Complaint for Patent Infringement against Defendants Halliburton and Cimarex Energy Co. ("Cimarex") (collectively, "Defendants") on April 15, 2021.  *See* Dkt. 1; *see also* Dkt. 14 (Amended Complaint); Dkt. 32 (Second Amended Complaint).  Specifically, USWS asserted seven related USWS patents, all of which are directed to USWS's novel electric fracturing (also referred to as "fracking") technologies—of which Halliburton was well aware.  *Id.*   In response, Halliburton filed counterclaims asserting infringement of a hodgepodge of Halliburton patents.[1]  *See* Dkt. 43; Dkt. 45.  Six of Halliburton's

---

[1] Halliburton has also filed, to date, fourteen (14) petitions for *inter partes* review of fourteen (14) USWS patents, only seven of which are asserted in this litigation.  *See* IPR2021-01032 (U.S. Patent No. 9,410,410), IPR2021-01033 (U.S. Patent No. 8,789,601), IPR2021-01034 (U.S. Patent No. 10,337,308), IPR2021-01035 (U.S. Patent No. 9,970,278), IPR2021-01036 (U.S. Patent No. 9,611,728), IPR2021-01037 (U.S. Patent No. 9,745,840) (IPRs covering USWS's asserted patents); *see also* IPR2021-01038 (U.S. Patent No. 10,408,030), IPR2021-01065 (U.S. Patent No. 9,840,901), IPR2021-01066 (U.S. Patent No. 10,020,711), IPR2021-01238 (U.S. Patent No. 10,526,882), IPR2021-01315 (U.S. Patent No. 9,893,500), IPR2021-01316 (U.S. Patent No. 10,280,724), IPR2021-01538 (U.S. Patent No. 10,408,031), and IPR2021-01539 (U.S. Patent No. 10,648,311) (IPRs covering unasserted patents).

asserted patents are not even related to electric fracturing. *Id.* There can be no doubt, Halliburton's asserted patents—and now its proposed constructions of the terms thereof—are manufactured for litigation and an attempt to impose leverage on USWS. The Court should reject Halliburton's litigation-driven constructions and adopt USWS's proposed constructions, which are consistent with the intrinsic (and extrinsic) evidence.

## II.   LEGAL STANDARD

The Court is familiar with the legal standard for claim construction. *See, e.g.*, *BCS Software, LLC v. Open Text, Inc.*, No. 6:21-cv-00050-ADA, Claim Construction Order, Dkt. 38 (W.D. Tex. Oct. 20, 2021); *see also* Standing Order Governing Proceedings – Patent Case (Dkt. 53) ("the Court is very familiar with the law of claim construction"). Accordingly, USWS offers only a brief recitation of the canons of claim construction that are relevant to its arguments regarding the substantive issues of the disputed terms of the Asserted Halliburton Patents.

"[T]he construction of a patent is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996) (internal citations omitted). Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art ("POSITA") after reviewing the intrinsic record at the time of the invention. *Phillips v. AWH Corporation*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). However, a court may construe a claim term when the patentee acts as his own lexicographer or disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Also, when a term is too difficult or too technical in nature, the construction of a claim may nonetheless be necessary to help the jury's understanding of the term. *See Image Processing Techs., LLC v. Samsung Elecs. Co.*, No 2:16-CV-505, 2017 U.S. Dist. LEXIS 95448, at *90 (E.D.

Tex. June 21, 2017) (a court may engage in construction of a term if it would "be helpful for the jury"); *see also Eceipt, LLC v. Victoria's Secret Stores, LLC*, No. 6:20-CV-747-ADA, No. 6:20-CV-754-ADA, 2021 U.S. Dist. LEXIS 167543, at *8 (W.D. Tex. Sept. 3, 2021) (declining to construe claims that were not too difficult or too technical in nature such that a construction would help the jury's understanding of them) (citing *Kroy IP Holdings, LLC v. Safeway, Inc.*, No. 2:12-cv-800-WCB, 2014 U.S. Dist. LEXIS 102136, at *2 (E.D. Tex. July 28, 2014)).

Furthermore, "indefiniteness is a question of law and in effect part of claim construction." *Digital Retail Apps, Inc. v. H-E-B*, No. 6-19-CV-00167-ADA, 2020 U.S. Dist. LEXIS 11094, at *7 (W.D. Tex. Jan. 23, 2020) (quoting *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012)). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim must, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If a claim does not satisfy this, "the claim fails § 112, ¶ 2 and is therefore invalid as indefinite." *Digital Retail Apps*, 2020 U.S. Dist. LEXIS 11094 at *8 (citing *Nautilus*, 577 U.S. at 910). Claim language that does not provide an objective standard for determining the scope and instead "relies on the unrestrained, subjective opinion of the person practicing the invention would be language that fails to provide a person skilled in the art with reasonable certainty as to the scope of the invention." *Versata Software, Inc. v. Zoho Corporation*, 213 F.Supp.3d 829, 835 (W.D. Tex. 2016) (quoting *Prolifiq Software Inc. v. Veeva Sys.*, No. C 13–03644 SI, 2014 WL 3870016, at *5 (N.D. Cal. Aug. 6, 2014)). The "definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters post hoc." *Nautilus*, 577 U.S. at 911.

## III.    AGREED TERMS

### A.    Halliburton's Asserted '949 Patent

Halliburton asserts Claims 1-5 and 8-12 of the '949 Patent titled "Method and Apparatus for Controlling the Manufacture of Well Treatment Fluid" against USWS.  Exhibit A, '949 Patent. The '949 Patent was filed as Application No. 11/691,623 on March 27, 2007, and issued on November 23, 2010.

### 1.    *Background of the '949 Patent*

The '949 Patent is directed to "methods and apparatus for controlling the product of well treatment fluid."  Exhibit A, '949 Patent, Abstract.  The '949 Patent describes that the apparatus claimed by the invention includes "a sand system."  Further, the '949 Patent describes that the claimed method "includes determining an output rate from a sand system."

### 2.    *Agreed Term: "a sand system with a means for determining an output rate of the sand system" (Claim 8)*

| Agreed Construction |
|---|
| Function: "determining an output rate of the sand system" |
| Structure: "a densometer, speed sensor, weight sensor, tub height sensor, or combination thereof, and equivalents thereof" |

The Parties agree that the term "a sand system with a means for determining an output rate of the sand system" is governed by 35 U.S.C. § 112(6) as a means-plus-function claim.  Further, the Parties have agreed that the function of the term is "determining an output rate of the sand system" and the corresponding structure is "a densometer, speed sensor, weight sensor, tub height sensor, or combination thereof, and equivalents thereof."  Accordingly, there is no need for the Court to engage in further construction of the term.

IV.     **CLAIM CONSTRUCTIONS OF THE DISPUTED TERMS**[2]

In each section below, USWS provides it proposed claim constructions and intrinsic/extrinsic evidence in support thereof for each disputed term of the seven Asserted Halliburton Patents.  For the reasons presented below, the Court should adopt each of USWS's proposed constructions because the evidence shows that such claims constructions represent the meaning a person of ordinary skill in the art would attribute to each of the disputed terms in this case.  *See Phillips*, 415 F.3d at 1315.

A.      **Halliburton's Asserted '475 Patent**

Halliburton asserts Claims 1-4 and 6-15 of the '475 Patent titled "Distribution Unit" against USWS.  Exhibit B, '475 Patent.  The '475 Patent was filed as Application No. 16/333,953 claiming priority to a PCT Application No. PCT/US2016/057336, filed on October 17, 2016.  After a single office action, the '475 Patent issued on January 26, 2021, after applicant Halliburton accepted an Examiner's amendment to independent Claims 1 and 17.

1.      *Background of the '475 Patent*

The '475 Patent describes a system and method for distributing electrical, hydraulic, and/or pneumatic power from a central source to a plurality of equipment for performing hydraulic well stimulation treatments.  Ex. B, '475 Patent, Abstract, 1:13-16.

Traditionally, a manifold trailer at a hydraulic fracturing operation would only route low pressure and high pressure fracturing fluids between a blender and one or more hydraulic pumps configured to increase the pressure of the fracturing fluid before pumping the fracturing fluid into

---

[2] For the convenience of the Court, and in view of the Court's Standing Order Governing Proceedings – Patent Case (Dkt. 53), USWS organizes its discussion of the disputed terms based on the patent number, claim number, and order of appearance of the term for the terms USWS seeks a specific construction for first.  USWS then separately provides its arguments regarding the indefiniteness of the terms of the remaining Asserted Halliburton Patents in a similar order.

the wellbore to fracture a downhole formation.  *Id*. at 34-41.  According to the '472 Patent, the hydraulic pumps used to increase the pressure of the fracturing fluid were historically powered by diesel engines coupled to each pump at the well site.  *Id*. at 2:48-51.

Accordingly, as an important aspect of the invention, the '475 Patent describes methods and systems for distributing the electric, hydraulic, and/or pneumatic power to a plurality of well stimulation units (such as pumps used to increase the pressure of a fracking fluid) through a central manifold "distribution unit" having "a body."  *Id*. at 3:61-4:12.  According to embodiments of the invention, the distribution unit may "route power, fuel, electrical signals, fluid, and/or other resources" to the stimulation equipment "to perform well stimulation operations."  *Id*. at 3:61-65. These "resources" are all routed "through" a "protective structure" or "body" of the distribution unit to the various pieces of well stimulation equipment.  *Id*. at 6:47-50.

**2.**     ***Disputed Terms: "distribution unit" (Claims 1-4, 6-9, 13, 15) and "body" (Claims 1, 3, and 12)***

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| "distribution unit" means "a singular manifold for distributing electric, pneumatic, and/or hydraulic power" | Plain and ordinary meaning; no further construction required |
| "body" means "a single body" | Plain and ordinary meaning; no further construction required |

The Parties dispute whether "distribution unit" means "a singular manifold for distributing electric, pneumatic, and/or hydraulic power" or whether the term has a plain and ordinary meaning to a person of ordinary skill in the art; and whether the term "body" means "a single body" or whether the term has a plain and ordinary meaning to a person of ordinary skill in the art.  The term "distribution unit" appears in asserted Claims 1-4, 6-9, 13, and 15 and "body" appears in asserted Claims 1, 3, and 12.  As shown below, the intrinsic evidence of the '475 Patent clearly

6

shows that both "distribution unit" and "body" refer to a single body/manifold that distributes electric, pneumatic, and/or hydraulic power to the plurality of stimulation equipment units.

The claim language of the '475 Patent is clear that "a/the body" and "a/the distribution" unit refers to a single body/manifold for distributing electric, hydraulic, and/or pneumatic power. For instance, Claim 1 recites, *inter alia*:

> 1.  A system, comprising:
>
> a power source;
>
> **a distribution unit** coupled to the power source, the distribution unit comprising:
>
>> **a body**;
>>
>> a plurality of connecting points **disposed along the body** for coupling the distribution unit to a plurality of stimulation equipment units; and
>>
>> an arrangement of cables or conduits **disposed through the body** between the power source and the plurality of connecting points to deliver power…; and
>>
>> a manifold of fluid lines **disposed through the body** for delivering treatment fluids….

Ex. B, '475 Patent, Claim 1 (emphasis added); *see also* Claim 3 ("a common bus disposed along the length **of the body**…) (emphasis added); Claim 6 ("a fuel source coupled to **the distribution unit, wherein the distribution unit** comprises...") (emphasis added); Claims 7-9 ("wherein **the distribution unit** further comprises…") (emphasis added).  In each of these asserted claims, the distribution unit/body of the distribution unit is referred to in a singular form.  For instance, the claims specify that both the fluid and power lines are disposed through a single body of the distribution unit to connect to the plurality of stimulation equipment units.  As such, the claims implicitly define the body of distribution unit as a singular manifold.

The specification provides further support for USWS's proposed construction of "a/the distribution unit" and "a/the body."  *First*, every figure of the claimed invention illustrates that the

distribution unit and the body of the distribution unit are a single manifold.  For instance, FIG. 1

provides a representative illustration of the system taught and claimed by the '475 Patent:



Ex. B, '475 Patent, FIG. 1 (reproduced and annotated above); *see also* FIG. 2.  Such illustration

clearly show that the distribution unit (reference numeral 26 in FIG. 1) is a **singular manifold**

(*i.e.*, a single body, illustrated as reference numeral 29) that distributes electrical, hydraulic, and

pneumatic power to the plurality of well stimulation equipment (reference numerals 20 are high

pressure pumps).  *Second*, the text of the specification confirms that a person of ordinary skill in

the art, reading the '475 Patent, would understand that a "distribution unit" "having a body" refers

to a singular manifold for distributing the various resources to the plurality of well stimulation

equipment.  For instance, the '475 Patent specifically describes that:

> the distribution unit 26 may include a body 29 and an arrangement
> of cables or conduits disposed in the body 29 and designed to route
> power/fuel from the power/fuel source 28 to various components
> (e.g., blender 18, high pressure pumping units 20, and control center
> 22) coupled to the distribution unit.

Ex. B, '475 Patent, 4:4-9.  Similar to the language of the claims and illustrations of the figures, the "disposed through" language in the specification indicates that the body of the distribution unit is a singular manifold wherein all of the fluid and power distribution lines run through.

Finally, the prosecution history memorializes that the "inventive" concept disclosed by the '475 Patent is that the distribution unit is a singular manifold (with a single body) that routes electric, hydraulic, and pneumatic power to a plurality of well stimulation equipment.  For instance, as mentioned, the '953 Application (which later became the '475 Patent) received a Notice of Allowance after Halliburton accepted an Examiner's Amendment to Claims 1 and 17.[3] *See* Exhibit C, Excerpt of the File History of the '475 Patent, Notice of Allowability, pp. 2-3. Importantly, the Examiner's Amendment amended Claim 1 to specify that the distribution unit included "a manifold of fluid lines underlined disposed through the body for delivering [treatment fluid to the plurality of stimulation equipment units]."  *Id*. (underlined portion added by Examiner).

Furthermore, and most importantly, the Examiner's "Reasons for Allowance" clearly states that the body of the distribution unit is a single body.  *See Uniloc 2017 LLC v. Google LLC*, No. 2:18-CV-00503-JRG-RSP, 2020 U.S. Dist. LEXIS 16314, at *32 (E.D. Tex. Jan. 30, 2020) ("An examiner's reason for allowance can carry significant weight in a claim construction analysis because it is evidence of how one of skill in the art understood the term at the time the application was filed.") (citing *Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1136 (Fed Cir. 2018)).  Here, in the June 8, 2020 Notice of Allowance, the Examiner unequivocally states, "the claimed combination of the fluid and power lines being combined within **a single body of a distribution unit** was found to be novel over the prior art."  *See* Ex. C, Excerpt of the File History of the '475 Patent, Notice of Allowability, pp. 2-3.  Accordingly, this Court should attribute "significant

---

[3] Claim 17 of the '475 Patent is not asserted by Halliburton.

weight" to the '953 Application's Examiner's Reasons for Allowance because it is clear evidence of how a person of ordinary skill in the art would have understood the terms "a distribution unit" and "a body" at the time the '953 Application was filed to refer to "**a single body of a distribution unit**." *Id.*; *accord Uniloc*, 2020 U.S. Dist. LEXIS 16314 at *32; *Phillips*, 215 F.3d at 1313. Such evidence clearly demonstrates that the terms "distribution unit" and "body" mean "a singular manifold for distributing electric, pneumatic, and/or hydraulic power" and "a single body," respectively.

For these reasons, the intrinsic evidence, including the claims, the figures, the specification, and the prosecution history demonstrate that the "a/the distribution unit" should be construed as "a singular manifold for distributing electric, pneumatic, and/or hydraulic power" and "a/the body" of the distribution unit should be construed as "a single body." The Court should adopt USWS's proposed constructions for the terms.

**B.    Halliburton's Asserted '472 Patent**

Halliburton asserts Claims 1-20 of the '472 Patent titled "Discrete Emissions Detection for a Site" against USWS. Exhibit D, '472 Patent. The '472 Patent was filed as Application No. 16/464,173 and claims priority to PCT Application No. PCT/US2016/069122, filed on December 29, 2016, and issued on March 16, 2021.

*1.    Background of the '472 Patent*

The '472 Patent is directed to methods and apparatus for detecting and mapping emissions at an oilfield well site and controlling equipment in response to the detection of hazardous levels of emissions at the well site. Ex. D, '472 Patent, 1:13-22. To detect and measure a concentration level of emissions at the well site, the '472 Patent describes that one or more sensors may be positioned on or around different pieces of equipment at various "areas" or "regions" of the well

site. *Id*. at 3:45-58. Each sensor may measure and record a concentration level of an emission (such as a gas, fluid, noise, or other emitted and measurable signal) in one of the "regions" of the well site and report/transmit such measurement to an "information handling system," (*i.e.*, a control unit). *Id*. at 3:58-65, 5:8-15. In disclosed embodiments, the '472 Patent describes that the information handling system may display the concentration levels measured by the sensors at the various "regions" of the well site location on a map. The mapping of the emissions depicts "concentration level contours" associated with the various "regions" or pieces of equipment on the well site, which allows a well site operator to electronically monitor the emissions, and thus the safety conditions, at a well site. *Id*. at 5:8-34.

Accordingly, the '472 Patent discloses a system and method for determining whether an "area" or "region" at the well site location is negatively "impacted" by an emission by determining whether the measured concentration level of emissions of the "area" or "region" has exceeded a threshold value. *See, e.g.*, *id*. at 9:49-10:48. The threshold value may be specific to one of the "areas" or "regions" of the well site location, and may be further based on "industry standards," "environmental standards," "safety standards," or any other standard for the type of equipment within the region. *Id*. at 10:28-48. Accordingly, when the emission levels within an "area" or "region" exceed the threshold value, and are thus considered to be "dangerous" or "hazardous," the '472 Patent teaches that the control unit may adjust or shut off the operation of any piece of equipment within the "critical area" or "impacted region" to prevent the hazardous or dangerous emissions from negatively impacting or damage the equipment in the region. *Id*. at 9:29-40.

### 2. *Disputed Term: "impacted regions" (Claims 1, 8, and 15)*

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| "an area of location where a concentration level of an emission exceeds a threshold value" | Plain and ordinary meaning; no further construction required |

The Parties dispute whether the term "impacted regions" should be construed in view of the intrinsic evidence of the '472 Patent, or whether the term should be afforded its plain and ordinary meaning.  The term "impacted regions" appears in Claims 1, 8, and 15 of the '472 Patent. In each claim, the term "impacted regions" appears three times in a similar manner:

> determining [determine] one or more **impacted regions** of the one or more regions based, at least in part, on a comparison of the one or more concentration levels to one or more threshold concentration levels;
>
> identifying [identify] one or more impacted devices associated with the one or more **impacted regions**, wherein the one or more impacted devices comprise at least one of the one or more devices; and
>
> altering [alter] an operation of at least one of the one or more impacted devices based, at least in part, on one or more impacts associated with the one or more **impacted regions**."

Ex. D, '472 Patent, Claim 1 (emphasis added), Claims 8 and 15 (bracketed language).

Outside of the context of the '472 Patent, the meaning of "impacted regions" would not be immediately apparent to a person of ordinary skill in the art.  Accordingly, the intrinsic record of the '472 Patent provides that an "impacted region" means "area of the location where a concentration level of an emission exceeds a threshold value."

For instance, the claim language of Claims 1, 8, and 15 of the '472 Patent illustrates that an "impacted region" has a different meaning than a "region" of the well site in the context of the invention.  Whereas as a location (*i.e.*, a well site) may have "one or more regions," an "impacted region" is ***determined*** "based, at least in part, on a comparison of the received concentration level … to the threshold concentration level."  Ex. D, '472 Patent, 9:9-11.  However, the language of the claims fails to fully define when or how one or more regions is determined to be an "impacted region."  Rather, the language of Claims 1, 8, and 15 only provides that the "impacted regions"

are determined based on a comparison between the measured emission concentration levels and a threshold concentration level.

Furthermore, the specification of the '472 Patent unequivocally defines that an "impacted region" to mean "an area of the location where a concentration level of an emission exceeds a threshold value."  Ex. D, '472 Patent, 10:22-25 ("In one or more embodiments, a critical area or impacted region may be an area of the location where a concentration level of an emission exceeds a threshold value.").  Notably, however, the specification fails to provide any other embodiment of how the methods and systems described by the '472 Patent determine when one of the "regions" of the location is an "impacted region" in the context of the claims.

Where, as here, a patentee acts as his own lexicographer and defines a term that does not otherwise have a plain and ordinary meaning, the patentee's definition governs.  *Phillips*, 415 F.3d at 1316; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[A] claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in … the specification.").  Accordingly, an "impacted region" can only be understood by a person of ordinary skill in the art as a "region"[4] where a measured emission concentration level exceeds the threshold concentration level for that region.  Reading Claims 1, 8, and 15 in the context of the entire '472 Patent, a person of ordinary skill in the art would understand such distinction between a "region" and an "impacted region" and would necessarily associate the term "impacted region" with "an area of the location where a concentration level of an emission exceeds a threshold value," as defined by the specification.

---

[4] In further anticipation of Halliburton's arguments, USWS contends that both the '472 Patent and the supporting extrinsic evidence show that the term "region" means "an area."  *See* Ex. D, '472 Patent, 1:15-17, 5:31-40, 6:34-36, 7:13-23 (using the phrase "area or region"); *see also* Exhibit E, Merriam-Webster Dictionary, Online ("region" – "an indefinite area of the world or universe.").

Further, the remaining portions of the specification of the '472 Patent provide additional context to suggest that an "impacted region" can only mean "an area of the location where a concentration level of an emission exceeds a threshold value."

*First*, the '472 Patent defines that the threshold value "may be based on one or more industry standards, one or more environmental standards, one or more safety standards, equipment or manufacturer specifications, any other specification or standard, or any combination thereof." Ex. D, '472 Patent, 10:28-32.   Such standards, such as Occupational Safety and Health Administration (OSHA) threshold limits, explosive limits, or flammability limits, set the "threshold" value for determining whether a region is considered "impacted" when a measure emission exceeds such standard safety or operational value. *See id*. at 5:50-64.  Accordingly, when the measured emission level exceeds such limits, the "region" may be properly considered as being "impacted" based on the respective threshold value for the equipment within said "region."

*Second*, in the context of "determining" when a "region" of the well site location is "impacted," the '472 Patent states:

> the control unit…or information handling system … may survey any one or more of the devices…associated with the concentration level of emission received from the sensor … to determine if a **detected concentration level of emission may cause or more impacts (such as a negative impact) on any one or more of the devices**….
>
> A negative impact may comprise overspeed or run-away of an engine, unexpected shutdown of a generator, damage to any one or more devices, potential harm to personnel in the area, or any other adverse impact on or at a location, device, personnel, or any other resource.

Ex. D, '472 Patent, 9:57-10:2 (emphasis added).  Such statements clearly demonstrate that a "region" of the location is negatively "impacted" when the measured emissions levels exceed safe operating conditions corresponding to that region.

*Third*, the '472 Patent further describes methods for predicting "potential" or "predicted impacts" based on the measured emissions levels.  For instance, the '472 Patent describes that "[a] predicted impact may comprise a determination that detected levels will soon **exceed a threshold concentration level** (for example, a level that has been determined to be a dangerous level) near operating equipment, for example, one or more devices."  *Id*. at 11:46-51 (emphasis added).

These supplementary teachings of the '472 Patent make it abundantly clear that the determination of whether a "region" is an "impacted region" hinges on whether "a concentration level of an emission exceeds a threshold value."  Accordingly, a person of ordinary skill in the art would understand the term "impacted regions" to mean "an area of the location where a concentration level of an emission exceeds a threshold value."

Finally, Halliburton's proposed construction that the term "impacted region" should not be construed and only be given its plain and ordinary meaning, entirely ignores the fact that the '472 Patent has defined the term, and that a person of ordinary skill in the art would not have a preconceived understanding of what "impacted regions" meant outside the scope of the '472 Patent. When a patentee deliberately defines a term without ambiguity or incompleteness, such as the way the '472 Patent defines "impacted regions" as "an area of the location where a concentration level of an emission exceeds a threshold value," a person of ordinary skill in the art would necessarily ascribe such definition to the term.  *See CCS Fitness*, 288 F.3d at 1366; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term.").

Accordingly, the Court should construe the term "impacted regions" as it is defined and used in the specification of the '472 Patent.

### C.   Halliburton's Asserted '695 Patent and '725 Patent

Halliburton asserts Claims 27-33, 40-63, 70-89, and 96-111 of the (reissued) '695 Patent titled "Electric or Natural Gas Fired Small Footprint Fracturing Fluid Blending and Pumping Equipment" against USWS.  Exhibit F, '695 Patent.  The '695 Patent is a reissued patent of U.S. Patent No. 8,834,012 ("the '012 Patent"), which was filed as Application No. 12/774,959 on May 6, 2010, and issued on September 16, 2014.  The '695 Patent issued on November 5, 2019.  Both the asserted '695 Patent and the '012 Patent are continuations-in-part of Application No. 12/557,730, filed on September 11, 2009, which is now issued as U.S. Patent No. 8,444,312 ("the '312 Patent").  Further, the '695 Patent is a divisional application of the '725 Patent (discussed below).

Halliburton also asserts Claims 83-87 and 89-93 of the (reissued) '725 Patent also titled "Electric or Natural Gas Fired Small Footprint Fracturing Fluid Blending and Pumping Equipment" against USWS.  Exhibit G, '725 Patent.  The '725 Patent is also a reissue of the '012 Patent and a continuation-in part of the '312 Patent.

### 1.   Background of the '695 Patent and '725 Patent

The '695 Patent and the '725 Patent share a significant portion of a common specification. As mentioned, both the '695 and '725 Patents are reissued patents of U.S. Patent No. 8,834,012, and are both directed towards methods and systems for "integral storage and blending of the materials used in oilfield operations," such as gelled fracturing fluids.  Ex. F, '695 Patent, Abstract; Ex. G, '725 Patent, Abstract.  In the reissued claims, the '695 and '725 Patents recite methods and systems for "preparing a fluid for use in a subterranean operation" comprising steps to create a

gelled fracturing fluid from a gel powder, and pumping said gelled fracturing fluid into a down hole location using a pump powered by natural gas or electricity.  *See* Ex. F, '695 Patent, Claims 27, 56, 84; *see also* Ex. G, '725 Patent, Claims 27 (not asserted), 83, 89.

The '695 and '725 Patents describe an "Integrated Material Storage and Blending System (IMSBS)" for preparing the gelled fracturing fluid.  Ex. F, '695 Patent, 3:53-55; Ex. G, '725 Patent, 3:32-35.  The IMSBS includes a number of storage units which contain "sand, proppants or other solid materials used to prepare a desired well treatment fluid."  Ex. F, '695 Patent, 3:56-58; Ex. G, '725 Patent, 3:36-38.  Specifically, the '695 and '725 Patents disclose that IMSBS may have "one or more Integrated Pre-Gel Blenders (IPB)" for preparing a fracturing fluid.  Ex. F, '695 Patent, 4:52-56; Ex. G, '725 Patent, 4:31-35.  The pre-gel storage unit contains a gel powder, such as a dry polymer, which is mixed with water to form a gelled fracturing fluid.  Ex. F, '695 Patent, 4:62-66, 5:15-20; Ex. G, '725 Patent, 4:41-45, 4:61-66.  The gelled fracturing fluid may then be pumped to a blender and, eventually, into the wellbore via a down hole pump.

> **2.    Disputed Term: "pre-gel storage unit" ('695 Patent: Claims 27, 28, 33, 44-48, 50, 52-55, 57, 62-63, 70-72, 74, 76-79, 88, 96-98, 100, 102-105) ('725 Patent: Claims 83, 85, 86, 89, 91, 92)**

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| "a storage bin or tank containing a gel powder for preparing a gelled fracturing fluid" | Plain and ordinary meaning; no further construction required. |

The Parties dispute whether the term "pre-gel storage unit" would be understood to a person of ordinary skill in the art to mean "a storage bin or tank containing a gel powder for preparing a gelled fracturing fluid," or whether the term should have its plain and ordinary meaning.  The term "pre-gel storage unit" appears in asserted Claims 27, 28, 33, 44-48, 50, 52-55, 57, 62-63, 70-72, 74, 76-79, 88, 96-98, 100, 102-105 of the '695 Patent and asserted Claims 83, 85, 86, 89, 91, 92 of the '725 Patent.

The intrinsic evidence of both the '695 Patent and the '725 Patent clearly shows that the term "pre-gel storage unit" means "a storage bin or tank containing a gel powder for preparing a gelled fracturing fluid."  For instance, the '695 Patent unequivocally states, "as would be appreciated by those of ordinary skill in the art, the pre-gel storage unit may be a storage bin, a tank, or any other desirable storage unit."  Ex. F, '695 Patent, 4:59-62; *see also* Ex. G, '725 Patent, 4:38-41 (providing the same description of a "pre-gel storage unit").  Further, the '695 and '725 Patents state that "the pre-gel storage unit 202 may contain the gel powder used for preparing the gelled fracturing fluid."  Ex. F, '695 Patent, 4:62-64; Ex. G, '725 Patent, 4:41-43.

Such statements "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term."  *Eceipt*, 2021 U.S. Dist. LEXIS 167543 at *4 (citing *Thorner*, 669 F.3d at 1365).  Thus, Halliburton has acted as its own lexicographer in the '695 Patent and '725 Patent by defining the term "pre-gel storage unit" as "a storage bin or tank containing a gel powder for preparing a gelled fracturing fluid" and the Court should construe the term accordingly, as USWS has proposed.

### 3.    Disputed Term: "partially hydrate" ('695 Patent: Asserted Claim 27)

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| Indefinite under 35 U.S.C. § 112; If the term is construed, it should mean "mixing the gel powder with a water-based fluid to form a mixture of fluid and powder" | Plain and ordinary meaning; no further construction required |

The Parties dispute whether the term "partially hydrate" is indefinite or, alternatively, whether the term means "partially mixing [a] gel powder with a water-based fluid to form a mixture of fluid and powder," or should have its plain and ordinary meaning.  The term "partially hydrate"

appears in asserted Claim 27 of the '695 Patent.[5]

USWS contends that the term "partially hydrate" is a term of degree that fails to provide any objective boundaries for those of skill in the art and thus, is indefinite. *Interval Licensing, LLC v. AOL, Inc.*, 766 F.3d 1364, 1368-74 (Fed. Cir. 2014) ("The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art.") (citing *Nautilus*, 572 U.S. at 910 and n. 8). *First*, none of the claims which include the term "partially hydrate" provides any objective boundary to a person of ordinary skill in the art. For instance, Claim 27 recites "[a] method of preparing a fluid for use in a subterranean operation" comprising the step of "allowing [a] gel powder to at least partially hydrate in the pre-gel storage unit to form a hydrated mixture." Ex. F, '695 Patent, Claim 27. The remaining claims that use the term "partially hydrate" merely specify the location of the claimed system where the "gel powder" "partially hydrate[s]." *See, e.g.*, *id.*, Claim 35, 65, 91 (gel powder allowed to "partially hydrate in the annual space"); Claims 38, 68, 94 (gel powder allowed to "partially hydrate in the tubular hydration loop").

*Second*, the term "partially hydrate" does not appear in the specification of the '695 Patent in any capacity. This alone is enough to render the disputed term indefinite. *See, e.g.*, *João Control & Monitoring Sys., LLC v. Protect Am., Inc.*, No. 1-14-CV-134-LY, 2015 U.S. Dist. LEXIS 109187, at *23 (W.D. Tex. Aug. 18, 2015) (concluding that "the specification to which the artisan would turn to resolve any ambiguities in the terms' definition provides no additional guidance to discern the exact courts of the [terms in dispute] with any degree of reasonable certainty" and holding those terms indefinite) Furthermore, the '695 Patent uses the term "hydrate" in the

---

[5] The term "partially hydrate" also appears in non-asserted Claims 35, 38, 65, 68, 91, and 94 of the '695 Patent.

specification and the claims; however, the '695 Patent entirely fails to distinguish between "hydrate" and "partially hydrate" or offer any context or objective boundaries to a person of ordinary skill in the art as to the difference between a full "hydration" of a gel-powder versus a "partial hydration" of a gel-powder.  *See, e.g.*, Ex. F, '695 Patent, 7:27-31 (describing that "hydration" of a gel powder comprises "[t]he mixer 412 mixes the gel powder from the pre-gel storage unit 402 with water from the water pump 416 at the desired concentration and the finished gel is discharged from the mixer 412.").  Accordingly, because the '695 Patent fails to provide a reasonably certain meaning to the term "partially hydrate," the Court should find the term indefinite.

If the term "partially hydrate" can be construed, the term should be tailored to mean "mixing the gel powder with a water-based fluid to form a mixture of fluid and powder."  This construction takes into account the only clear and reasonably certain description of what the '695 Patent means when it refers to "hydrating" a gel powder to form a gelled fracturing fluid.  *See id.* at 7:27-31 (describing that "hydration" of a gel powder comprises "[t]he mixer 412 mixes the gel powder from the pre-gel storage unit 402 with water from the water pump 416 at the desired concentration and the finished gel is discharged from the mixer 412.").  Accordingly, such construction distinguishes that "partially hydrate" means that the solution formed by the mixer (or elsewhere in the system) is a mixture of the gel powder and a water-based fluid.

### D.    Halliburton's Asserted '325 Patent

Halliburton asserts Claims 1-22 of the '325 Patent titled "Methods to Monitor System Sensor and Actuator Health and Performance" against USWS.  Exhibit H, '325 Patent.  The '325 Patent was filed as Application No. 11/700,735 on January 31, 2007, and issued on August 11, 2009.

### 1.    *Background of the '325 Patent*[6]

The '325 Patent is directed towards "a method for assessing health and performance of a system," such as automated equipment used in oilfield rigs.  Ex. H, '325 Patent, Abstract, 1:24-25.  To "assess" the health or performance of the automated equipment used in oilfield rigs, the '325 Patent describes methods of using sensors within one or more subsystems of the oilfield rig, for example, a sand or liquid blender, to redundantly process and compare output data measured by the sensors in order to determine whether the subsystem is likely to fail or operating outside predetermined operating conditions.  *See generally* Ex. H, '325 Patent at 1:55-2:37 (describing example and preferred embodiments of the methods claimed and described).

Accordingly, in order to "monitor" and "assess" the operations of each of the subsystems of the oilfield rig, the '325 Patent describes methods of "transforming" the output signals of the various subsystems of the oilfield into "a single, comparable set of data."  *Id*. at 4:5-22.  Once the signals from each of the subsystems are transformed into a comparable set of data, the monitoring system can determine whether a signal from one of the subsystems deviates from the other subsystems of the oilfield rig system.  *Id*.

### 2.    *Disputed Term: "does not agree" (Claims 1 and 4)*

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| Indefinite under 35 U.S.C. § 112 | Plain and ordinary meaning; no further construction required |

The Parties dispute whether the term "does not agree" is indefinite, or whether the term should be afforded its plain and ordinary meaning.  The disputed term appears in Claims 1 and 4 of the '325 Patent.

---

[6] In due course, USWS intends to file briefing to contest the subject-matter eligibility of the alleged inventions disclosed by the '325 Patent in accordance with 35 U.S.C. § 101.

*First*, looking to the language of the claims, USWS contends that the term "does not agree" is not reasonably clear.  For example, Claim 1 of the '325 Patent recites a method comprising the steps of "comparing at least some of the signals [associated with an oilfield equipment subsystem]; and indicating at least one oilfield subsystem's signal that **does not agree** with at least two other oilfield equipment subsystems' signals" (emphasis added).  This language is not reasonably clear as to what it means to "not agree" in the context of the comparison of one or more signals of the oilfield subsystems.  Ex. H, '325 Patent, Claim 1.

*Second*, the specification uses inconsistent terminology to describe the intended result of the "comparison" between the signals of the oilfield equipment subsystems (*i.e.*, to determine whether the signals "agree" or "do not agree").  For example, the '325 Patent describes that, when comparing the various signals, the system detects "discrepancies" between the signals (Ex. H, '325 Patent, 2:6-8, 13-15) or checks "standard deviations between signals" (*id*. at 4:21-22) to determine whether the system is operating correctly.

Furthermore, even the specification's use of "agreement" and "disagree" fails to offer any objective boundary to the term "does not agree" as used in the asserted claims.  For instance, the '325 Patent describes "compar[ing] the three transformed signals for agreement in stages 107A, 107B, and 107 … [i]f one signal is found to disagree with the other two signals, an output signal can be made to notify the operator that the particular component that is not in agreement needs maintenance or attention."  *Id*. at 3:34-39 (referring to FIG. 1).  Notably, such description does not give one of ordinary skill in the art any objective boundary as to whether "does not agree" means, for example, that the two signals being compared are not identical, are not within a certain range of one another, or are not within a predetermined boundary set by the operator of the system.  Thus, the specification contains no point of comparison for skilled artisans to determine an objective

22

boundary of what "does not agree" means in the context of comparing the signals of one or more oilfield subsystems.  The prosecution history of the '325 Patent is of no help to define or bound the meaning of "does not agree" as it fails to discuss the term at all.

Accordingly, the Court must find that the term "does not agree" is indefinite.  *See Interval Licensing*, 766 F.3d at 1371 (requiring that "the claims, when read in light of the specification and prosecution history, must provide objective boundaries for those of skill in the art."); 35 U.S.C. § 112, ¶ 2.

### 3.      *Disputed Term: "inconsistent output" (Claims 9 and 13)*

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| Indefinite under 35 U.S.C. § 112 | Plain and ordinary meaning; no further construction required |

The Parties dispute whether the term "inconsistent output" is indefinite, or whether the term should be afforded its plain and ordinary meaning.  The disputed term appears in Claims 9 and 13 of the '325 Patent.

As with the term "does not agree," the '325 Patent's use of the term "inconsistent output" is indefinite because it lacks reasonable certainty to a person of ordinary skill in the art.  *Nautilus*, 572 U.S. at 910; *Interval Licensing*, 766 F.3d at 1371; 35 U.S.C. § 112, ¶ 2.  USWS contends that the term "inconsistent" is a term of degree.

*First*, the claims of the '325 Patent haphazardly use the term "inconsistent" when referring to "checking" the readings/signals of the subsystems against one another.  For example, Claim 9 recites: "checking the respective readings of said multiple subsystems against each other to determine whether any subsystems having readings which are **physically inconsistent** with each other; and under at least some conditions, changing the controlling step to exclude the output of a respective subsystem which has been determined, in the checking step, to be showing **inconsistent**

**output**." Ex. H, '325 Patent, Claim 9.  Proper claim construction presumes that the '325 Patent's use of "physically inconsistent" means something different than "inconsistent output."  *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").  Accordingly, the claims of the '325 Patent fail to offer reasonable certainty as to what "inconsistent output" means.

*Second*, the term "inconsistent output" does not appear in the specification of the '325 Patent.  This deficiency alone is enough to render the disputed term indefinite, as the specification thus offers no guidance as to what the term means in the context of the claims.  *See João Control*, 2015 U.S. Dist. LEXIS 109187 at *23.  While, the term "inconsistent" appears in the specification, it is only used in the context of describing that the readings of the subsystems may be "physically inconsistent," similar to its use in Claim 9 discussed above.

Even assuming, *arguendo*, that the terms "physically inconsistent" and "inconsistent output" mean the same thing (they presumably do not), the specification of the '325 Patent still fails to provide any objective boundaries to determine when or how a signal is "inconsistent" with another signal during the "compare" step of the disclosed methods.  Instead, the '325 Patent leaves a person of ordinary skill in the art with a highly subjective understanding of what it means for the different signals of the oilfield subsystems to be "inconsistent."

As such, the term "inconsistent output" is indefinite because it lacks any objective boundaries necessary to render a term of degree definite.  *See Berkheimer v. Hewlett-Packard Co.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) (applying objective boundaries requirement to terms of degree).  The Court should find that "inconsistent output" is indefinite under 35 U.S.C. § 112, ¶ 2.

### E.      Halliburton's Asserted '333 Patent

Halliburton asserts Claims 1-12 of the '333 Patent titled "Corrosion Resistant Fluid End for Well Service Pumps" against USWS.  Exhibit I, '333 Patent.  The '333 Patent was filed as Application No. 13/332,452 on December 21, 2011, and issued on September 6, 2016.

#### 1.      Background of the '333 Patent

The '333 Patent is directed towards methods of using a fluid ends of reciprocating plunger pumps used in fracturing operations.  *See* Ex. I, '333 Patent, Abstract, 1:24-25.  More specifically, the '333 Patent describes methods of using fluid ends made with corrosion resistant alloys.  *Id.* at 2:35-37.  The '333 Patent teaches that without said corrosion resistant alloys, fluid ends are more susceptible to corrosion, leaks, and cracks, which, in turn, reduces the maximum operating pressure of the reciprocating plunger pumps and leads to higher rates of "fatigue" in the fluid end. *Id.* at 1:30-44.

#### 2.      Disputed Term: "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure" (Claims 1, 5, and 9)

| USWS's Proposed Construction | Halliburton's Proposed Construction |
|---|---|
| Indefinite under 35 U.S.C. § 112; To the extent the term is construed, the term should mean "a fluid end body having a tensile stress of 74 ksi when the service pump operates at 20,000 psi" | Plain and ordinary meaning; no further construction required |

The Parties dispute whether the term "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure" is indefinite under 35 U.S.C. § 112, ¶ 2 or whether the term has a plain and ordinary meaning.  The disputed term of the '333 Patent appears in independent Claims 1, 5, and 9.

USWS does not contend that the term "tensile stress," alone, is indefinite.  Indeed, the '333 Patent clearly defines what "tensile stress" means.  Ex. I, '333 Patent, 3:19-22 ("As used herein,

'tensile stress' is the measure of internal forces acting within a deformable body.  It may be considered as a measure of the average force per unit area of a surface within the body on which internal forces act.").  Rather, the phrase "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure," as used in Claims 1, 5, and 9, lacks the requisite degree of reasonable certainty to afford clear notice of what is claimed.  *Nautilus*, 572 U.S. at 910.  Accordingly, the Court should find the term indefinite.

> The disputed term appears in a similar manner in each of Claims 1, 5, and 9:
>
>> A method comprising:
>>
>> providing a well service pump;
>> providing a fluid end body that comprises a corrosion resistant alloy
>> (a) having a fatigue limit of at least 75 ksi and (b) comprising
>> chromium as an alloying element at 5% or greater by weight of the
>> corrosion resistant alloy'
>>
>> installing the fluid end body in the well service pump; and
>>
>> pumping an aqueous-based fluid through the fluid end body,
>> wherein the fatigue limit is greater than or equal to a **tensile stress
>> assumed by the fluid end body when the well service pump
>> operates at maximum working pressure** while pumping the
>> aqueous-based fluid…

Ex. I, '333 Patent, Claim 1 (emphasis added), Claim 5 (removes the step of "installing the fluid end …"), Claim 9 ("pumping a fracturing fluid through the fluid end body, wherein the fatigue limit is greater than or equal to **a tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure**…") (emphasis added).

The term "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure," as used in Claims 1, 5, and 9, fails to provide any notice as to what is meant by "a tensile stress **assumed**" by the fluid end body "at a maximum working pressure."  *See Nautilus*, 572 U.S. at 910 ("A patent must be precise enough to afford clear notice

of what is claimed, thereby apprising the public of what is still open to them.") (citations and internal quotation marks omitted).

*First*, the term "assumed," by definition, lacks the reasonable certainty necessary to render the scope of Claims 1, 5, and 9 definite. Neither the claims nor the specification describes what an "assumed" tensile stress would be in the context of the fluid end "provided" in the invention embodied by the claims.

The specification of the '333 Patent is of little aid. Neither of the terms "assumed" nor "assume" appear anywhere in the specification. As with other terms in the Asserted Halliburton Patents, this deficiency alone is enough to render the disputed term indefinite. *See João Control*, 2015 U.S. Dist. LEXIS 109187 at *23.

*Second*, the term "maximum working pressure" is a term of degree, which further demonstrates its indefiniteness. Courts have traditionally held terms of degree to be indefinite when a term is "purely subjective" and offers "no objective indication of the manner" in which it should be read in the claims. *Interval Licensing*, 766 F.3d 1364 at 1371; *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1349 (Fed. Cir. 2005); *Intellectual Ventures I LLC v. T Mobile USA, Inc.*, No. 2:17-CV-577-JRG, 2018 U.S. Dist. LEXIS 189510, at *28-29 (E.D. Tex. Nov. 6, 2018) ("[A] term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion.") (citing *Interval Licensing*, 766 F.3d at 1371).

Here, Claims 1, 5, and 9 fail to provide any objective boundaries of what the "maximum working pressure" is for the "fluid end" in Claims 1, 5, and 9.[7] As such, they fail to describe the

---

[7] Indeed, during prosecution of the '333 Patent the Examiner repeatedly found the term "maximum working pressure" to be indefinite in asserted Claim 1. *See* Exhibit J, Excerpts of File History of '333 Patent.

term with a reasonable certainty.  Accordingly, the Court should find the entire term "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure" is indefinite under 35 U.S.C. § 112, ¶ 2.

If "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure" can be construed, the construction should be tailored to the limited description in the '333 Patent, which is "a fluid end body having a tensile stress of 74 ksi when the service pump operates at 20,000 psi."  This construction takes into account the lone use of any term resembling the disputed term in the '333 Patent, *i.e.*, that, "under ideal conditions," the "maximum tensile stress" would be "74 ksi due to the maximum operating pressure of the fluid end of 20,000 psi in a particular fluid end…." Ex. I, '333 Patent, 5:31-39.  Notably, however, such "ideal conditions" fail to describe whether such a "maximum operating pressure" and "tensile stress" is associated with the specific fluid end claimed in the '333 Patent.

## V.  CONCLUSION

For the foregoing reasons, Counter-Defendant USWS respectfully requests that the Court adopt its proposed constructions for the following terms:

| Patent No. | Disputed Term (Claim No(s).) | Proposed Construction |
|---|---|---|
| 10,900,475 | "distribution unit" (Claims 1-4, 6-9, 13, 15) | "a singular manifold for distributing electric, pneumatic, and/or hydraulic power" |
| | "body" (Claims 1, 3, and 12) | "a single body" |
| 10,948,472 | "impacted regions" (Claims 1, 8, and 15) | "an area of location where a concentration level of an emission exceeds a threshold value" |
| RE 46,725 | "pre-gel storage unit" (Claims 83, 85, 86, 89, 91, 92) | "a storage bin or tank containing a gel powder for preparing a gelled fracturing fluid" |

| Patent No. | Disputed Term (Claim No(s).) | Proposed Construction |
|---|---|---|
| RE 47,695 | "pre-gel storage unit" (Claims 27, 28, 33, 44-48, 50, 52-55, 57, 62-63, 70-72, 74, 76-79, 88, 96-98, 100, 102-105) | "a storage bin or tank containing a gel powder for preparing a gelled fracturing fluid" |

Additionally, USWS respectfully requests that the Court find the following terms of Halliburton's Asserted Patents indefinite under 35 U.S.C. § 112, ¶ 2 or, alternatively, adopt USWS's alternative construction:

| Patent No. (Claim No.) | Indefinite Term | Alternative Construction (if any) |
|---|---|---|
| RE 47,695 | "partially hydrate" (Claim 27) | Alternatively, "mixing the gel powder with a water-based fluid to form a mixture of fluid and powder" |
| 7,574,325 | "does not agree" (Claims 1 and 4) | N/A |
| | "inconsistent output" (Claims 9 and 13) | N/A |
| 9,435,333 | "tensile stress assumed by the fluid end body when the well service pump operates at maximum working pressure" (Claims 1, 5, and 9) | Alternatively, "a fluid end body having a tensile stress of 74 ksi when the service pump operates at 20,000 psi" |

Dated: October 27, 2021

Respectfully submitted,

By: /s/ John A. Yates

John A. Yates
Texas State Bar No. 24056569
jyates@pattersonsheridan.com

John H. Barr, Jr.
Texas State Bar No. 00783605
jbarr@pattersonsheridan.com

B. Todd Patterson
Texas State Bar No. 00789537
tpatterson@pattersonsheridan.com

Kyrie K. Cameron
Texas State Bar No. 24097450

kcameron@pattersonsheridan.com

Edgar N. Gonzalez
Texas State Bar No. 24092431
egonzalez@pattersonsheridan.com

**Patterson + Sheridan LLP**
24 Greenway Plaza, Suite 1600
Houston, Texas 77046
(Tel): 713-623-4844
(Fax): 713-623-4846

*Attorneys for Plaintiff/Counter-Defendant,*
*U.S. Well Services, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2021, the foregoing was filed electronically in compliance with Local Rule CV-5(a) and served via the Court's electronic filing system on all counsel of record who have consented to electronic service.

/s/ John A. Yates
John A. Yates

Roger J. Fulghum
Michael Hawes (*admitted pro hac vice*)
**BAKER BOTTS LLP**
910 Louisiana
Houston, TX 77002
roger.fulghum@bakerbotts.com
michael.hawes@bakerbotts.com

David M. Genender (*admitted pro hac vice*)
Susan Cannon Kennedy (*admitted pro hac vice*)
Kirstie Wallace
David Tobin
**BAKER BOTTS L.L.P.**                              Syed K. Fareed
2001 Ross Avenue, Suite 900                         **BAKER BOTTS L.L.P.**
Dallas, Texas 75201-2980                            98 San Jacinto Boulevard, Suite 1500
david.genender@bakerbotts.com                       Austin, Texas 78701-4078
susan.kennedy@bakerbotts.com                        syed.fareed@bakerbotts.com
kirstie.wallace@bakerbotts.com
david.tobin@bakerbotts.com

*Attorneys of Record for Defendant/Counter-Plaintiff Halliburton Energy Services, Inc. and Counter-Plaintiff Halliburton US Technologies, Inc.*

Brian Christopher Nash
Steven P. Tepera
Timothy Franklin Dewberry
Austin Michael Schnell
**Pillsbury Winthrop Shaw Pittman LLP**
401 Congress Avenue, Suite 1700
Austin, TX 78701
brian.nash@pullsburylaw.com
steven.tepera@pillsburylaw.com
tim.dewberry@pillsburylaw.com
austin.schnell@pillsburylaw.com

*Attorneys of Record for Defendant Cimarex Energy Co.*